**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* WILLIAM FLOYD,<br><br>Plaintiff,<br><br>v.<br><br>AVISTA CAPITAL HOLDINGS, LP and GLOBAL CONTRACT MANUFACTURING MEDICAL & OEM, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 25 C 10894<br><br>Judge Joan H. Lefkow |

**OPINION AND ORDER**

William Floyd brings this action against Avista Capital Holdings, LP ("Avista") and Global Contract Manufacturing Medical & OEM, Inc. ("GCM"), asserting claims for submission of false or fraudulent claims to the United States government in violation of the False Claims Act ("FCA"), retaliation for engaging in conduct protected by the FCA and the Illinois Whistleblower Act ("IWA"), and common law retaliatory discharge. Before the court are Avista's and GCM's motions, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), to dismiss Floyd's amended complaint for failure to state a claim upon which relief can be granted. For the reasons set forth below, the court grants the motions to dismiss. Counts I, II, and III against both Avista and GCM are dismissed without prejudice for failing to state a claim. Counts IV and V against both Avista and GCM are dismissed without prejudice for lack of subject matter jurisdiction.

## BACKGROUND[1]

William Floyd began working for GCM as a quality supervisor on August 26, 2019, in Schiller Park, Illinois. GCM provides manufacturing, engineering, and other services to original equipment manufacturers including SpaceX, Solar Turbines, and Intuitive Surgical. Floyd's role as a quality supervisor included overseeing quality control operations, addressing quality control issues, inspecting, and filing inspection reports.

Avista, a private equity firm, acquired GCM in 2019 and owned GCM at all relevant times. Avista provides strategic insight, operational oversight, and senior counsel to companies it acquires. Avista and GCM share common employees, offices, and business names. Avista is incorporated in Delaware.[2]

In September 2019, GCM Quality Manager Victor Rivera told Floyd that under GCM's "ship it come hell or high water" policy, inspection reports provided to GCM's customers were regularly falsified to indicate that inspection protocols had been followed despite being routinely disregarded. (Dkt. 66 ¶ 43.) In December 2019, GCM's Operations Manager Duggan Henderson instructed Floyd to "cut down" on inspection protocols, and Floyd refused to do so. (Dkt. 66 ¶ 45.) In early January 2020, Amy FNO,[3] a member of GCM's upper management, asked Floyd to "push" jobs and complete them in timeframes that were impossible within GCM's inspection

---

[1] Floyd's well-pleaded allegations are accepted as true at the motion-to-dismiss stage. *Chaidez* v. *Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019).

[2] Although Floyd did not allege Avista's state of incorporation, searching the Delaware Department of State entity website reveals a filing for Avista Capital Holdings, LP, incorporated in Delaware. *See* State of Delaware, Department of State: Division of Corporations, https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx (last visited June 17, 2026). The court may "take judicial notice of matters of public record" outside the pleadings on a 12(b)(6) motion to dismiss and so takes notice of this public record that Avista was incorporated in Delaware. *Henson* v. *CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (internal citations and quotations omitted); *see Paulsen* v. *Abbott Lab'ys*, No. 15-CV-4144, 2018 WL 1508532, at *6 n.10 (N.D. Ill. Mar. 27, 2018).

[3] Floyd has named certain GCM employees by first name only ("FNO"). Throughout this opinion, any employees identified by Floyd only by first name will be referred to by that first name followed by "FNO".

protocols. (Dkt. 66 ¶ 47.) Floyd told Amy FNO that he could not do so within her timeframes. In May 2020, Floyd observed GCM Compliance Manager William DeLeon habitually marking partially inspected jobs as complete. Floyd heard from DeLeon that he was under pressure to reduce the number of internal defective manufacturing reports ("DMR") created. Multiple times, DeLeon, along with a Quality Technician Alicia Rodriguez and Engineer Jared Champagne, cut and pasted language from prior inspection reports to falsely certify that components had been fully inspected.

GCM manufactured several components for SpaceX, some requiring 100% inspection, others only requiring inspecting batch samples. When Floyd inspected inlet bases manufactured for SpaceX during his employment, they failed to pass inspections nearly 50% of the time relating to problems with the machining of the thread and pocket depths. Despite this high failure rate, GCM certified that inlet bases were in full conformance with SpaceX's specifications on virtually all orders for inlet bases. Floyd also observed bad threads and depths of threads on inner and outer cores manufactured for SpaceX but, despite internal reports reflecting those problems, GCM regularly certified that the cores were in full compliance with SpaceX's specifications.

On numerous occasions, Floyd inspected cannulas manufactured for Intuitive Surgical that did not conform to required ISO standards.[4] Despite informing a quality manager of the nonconformance, the nonconforming components were never discarded or rejected by GCM, and GCM falsely certified that the cannulas were in full compliance with Intuitive's contractual specifications and ISO standards.

On April 20, 2020, GCM Quality Inspector Javier Muñoz told Floyd that Epicor, GCM's enterprise resource planning software, indicated that Floyd had approved an inspection report

[4] According to the First Amended Complaint, ISO is an independent, non-government organization that publishes quality control standards.

that Floyd was not assigned to and could not approve. This inspection report described rods produced for Solar Turbines which had been sitting in GCM's inspection hold area the day before and had since been shipped to Solar Turbines. Some of the rods that Floyd inspected during his employment were manufactured pursuant to Solar Turbines's contracts with the U.S. Navy or the Defense Logistics Agency, but it is unknown if this shipment was manufactured pursuant to any government contract. Rods manufactured for Solar Turbines were contractually required to be 100% inspected, and Solar Turbines did not inspect the rods after receiving them from GCM.

Floyd discovered that someone else had logged into Epicor using his employee number and approved the inspection report in his name. Floyd deduced that the rods could not have been inspected within the provided time and concluded the rods had not been inspected and were falsely signed under his name. Floyd believed that it may have been Manufacturing and Production Manager Sean Gill, Shipping Manager James FNO, or Amy FNO. Floyd immediately asked DeLeon and Neoma Arcari, a representative from the human resources department, to review surveillance tapes from the inspection hold area for any irregularities or suspicious behavior. Floyd was not permitted to review the tapes himself. Later, Arcari informed Floyd that she had reviewed the tapes and confirmed that Floyd was not on the computer at the times when those inspection reports were submitted. Arcari claimed that "no irregularities were observed" on the tapes. (Dkt. 66 ¶ 61.)

In response, Floyd requested a comprehensive forensic data investigation and for the tapes to be sent to GCM's President, Seamus Meagher, for review. However, neither request was fulfilled. Approximately two weeks after that request, Meagher met with Floyd and heard Floyd's understanding of the security vulnerabilities in Epicor that allowed other employees to

use his employee number to commit fraud. Floyd also informed Meagher that the security vulnerabilities may have caused GCM to violate the Arms Export Control Act and its implementing regulations because CGM maintained a facility in China. Meagher took no action in response and told Floyd, “There is nothing I can do about this now.” (Dkt. 66 ¶ 65.) Floyd also met with Arcari on five occasions from July to October 2020 to discuss falsification of inspection records and willful disregard for inspection protocols.

In January 2020, DeLeon was offered the Quality Manager position that Henderson had assured Floyd that he was “first in line” for when he was hired. (Dkt. 66 ¶ 109.) On June 24, 2020, Floyd received a performance write-up from DeLeon purportedly due to an incorrectly-machined part returned to GCM by a customer. DeLeon conducted a performance review of Floyd in September 2020 that included the writeup from June 24, 2020, but did not include DeLeon’s previous compliments on Floyd’s performance. This review was not added to Floyd’s personnel file. Sometime after that review, Floyd emailed Quality Director Narsim Bindiganavale requesting a raise. In response, Bindiganavale held a conference call with Floyd, DeLeon, and Arcari, and Bindiganavale presented Floyd with a performance improvement plan to correct poor performance. Floyd disputed that his performance had been poor and Bindiganavale admitted that it had not been, so Floyd requested a follow-up meeting to include Rodriguez as well. That follow-up meeting occurred on October 7, 2020, where Rodriguez admitted to falsifying inspection reports “for all of these jobs” at DeLeon’s direction. (Dkt. 66 ¶ 67.)

On October 8, 2020, Floyd was forwarded an email announcing that GCM was launching an investigation into Floyd’s allegations of fraud, that Floyd was being placed on paid leave, and that Floyd was barred from participating in the investigation. On October 12, 2020, Floyd

received a letter from the human resources department informing him that GCM concluded its investigation and found no evidence to substantiate Floyd's allegations. Then on October 15, 2020, GCM terminated Floyd's employment and sent Floyd a separation letter.

Floyd initiated this lawsuit in the United States District Court for the Eastern District of Texas on November 8, 2021. On August 11, 2025, the case was transferred to this court under 28 U.S.C. § 1404(a). On October 15, 2025, Floyd filed an amended complaint. GCM and Avista separately moved to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 9(b).

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests whether the complaint states a claim on which relief may be granted." *Richards* v. *Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012); Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the plaintiff must establish that the requested relief is plausible on its face. *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007). In reviewing such a motion, the court accepts all well-pleaded factual allegations in the complaint as true and draws all reasonable inferences in a plaintiff's favor. *Tamayo* v. *Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (citations omitted). To survive a Rule 12(b)(6) motion, a complaint must be well-pleaded, meaning it contains sufficient factual detail, accepted as true, to state a plausible claim for relief that rises above the speculative level. *See Iqbal*, 556 U.S. at 678.

Claims of fraud arising under the FCA "are subject to the heightened pleading requirements of Rule 9(b)." *United States ex rel. Berkowitz* v. *Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018). Rule 9(b) requires that a plaintiff state the circumstances constituting fraud with "particularity." Fed. R. Civ. P. 9(b). Alleging fraud with particularity "means the who, what, when, where, and how: the first paragraph of any newspaper story." *United States ex rel.*

*Lusby* v. *Rolls-Royce Corp*., 570 F.3d 849, 853 (7th Cir. 2009) (quoting *DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). FCA retaliation claims, however, are not subject to Rule 9(b) heightened pleading requirements. *United States ex rel. Sibley* v. *Univ. of Chicago Med. Ctr.*, 44 F.4th 646, 662 (7th Cir. 2022).

## ANALYSIS

### I. Federal Claims Against Avista

#### A. Avista Vicarious Liability

Floyd asserts claims against Avista and GCM together as undifferentiated defendants. Avista argues that it cannot be held liable for GCM's acts. In general, a corporation "is not liable for the acts of its subsidiaries." *United States* v. *Bestfoods*, 524 U.S. 51, 61 (1998) (citation omitted). Under the alter ego or veil-piercing theory of liability, however, courts will allow plaintiffs to "impose liability on a defendant who unjustly seeks protection in the corporate form."[5] *Lumpkin* v. *Envirodyne Indus., Inc.*, 933 F.2d 449, 460 (7th Cir. 1991). It is only appropriate to pierce the corporate veil when "the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." *Bestfoods*, 524 U.S. at 62.

Avista is incorporated in Delaware, where piercing the corporate veil "is a tough thing to plead and a tougher thing to get." *Verdantus Advisors, LLC* v. *Parker Infrastructure Partners, LLC*, No. CV 2020-0194-KSJM, 2022 WL 611274, at *2 (Del. Ch. Mar. 2, 2022). [6] Delaware

[5] "The terms alter ego theory and piercing the corporate veil are used interchangeably." *Winner Acceptance Corp.* v. *Return on Cap. Corp.*, No. CIV.A. 3088-VP, 2008 WL 5352063, at *5 n.32 (Del. Ch. Dec. 23, 2008) (quotations and citations omitted).

[6] Because Floyd initiated this action in the United States District Court for the Eastern District of Texas, the court must perform a choice-of-law analysis to resolve the alter ego issue. Following a 28 U.S.C. § 1404(a) transfer initiated, as here, by a plaintiff, the transferee court must follow the choice-of-law rules that prevailed in the transferor court. *Ferens* v. *John Deere Co.*, 494 U.S. 516, 519 (1990); *see Nelson* v. *Sandoz Pharm. Corp.,* 288 F.3d 954, 963 n.7 (7th Cir. 2002). Both Illinois and Texas choice-of-law rules for veil-piercing claims are that "the law of

courts consider five factors: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a façade for the dominant shareholder." *PXP Producing Co. LLC* v. *MitEnergy Upstream LLC*, 342 A.3d 402, 417 (Del. Ch. 2025) (quoting *Doberstein* v. *G-P Indus., Inc.*, No. CV 9995-VCP, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015)). No single factor is determinative, but "a plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence." *MicroStrategy Inc*. v. *Acacia Rsch. Corp.*, No. CIV.A. 5735-VCP, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010). Furthermore, a plaintiff must allege facts to support a conclusion that failing to pierce the corporate veil will cause injustice or unfairness. *PXP*, 342 A.3d at 417 (citations omitted).

Avista argues that Floyd has failed to support an allegation that Avista is the alter ego of GCM because he has alleged no facts to support any of these five factors. Floyd does not directly address this issue in his response to Avista's motion to dismiss. Floyd alleges that Avista and GCM are "inextricably intertwined" and share "common employees, offices, and business names." (Dkt. 66 ¶ 26.) That Avista and GCM are inextricably intertwined is too conclusional to be afforded the assumption of truth at this stage. *See Iqbal*, 556 U.S at 664. Floyd's allegation that Avista and GCM share "common employees, offices, and business names" is insufficient to support piercing the corporate veil. *See EBG Holdings LLC* v. *Vredezicht's Gravenhage 109 B.V.*, No. CIV.A. 3184-VCP, 2008 WL 4057745, at *13 (Del. Ch. Sept. 2, 2008) (finding

---

the state of incorporation governs such claims." *Judson Atkinson Candies, Inc.* v. *Latini-Hohberger Dhimantec*, 529 F.3d 371, 378 (7th Cir. 2008*)*; *see Proxi Healthcare Staffing LLC* v. *Curative Talent, LLC*, No. 3:22-CV-2553-S, 2024 WL 779610, at *3 (N.D. Tex. Feb. 26, 2024).

commonalities including sharing offices, officers, and letterhead insufficient to pierce the corporate veil). Furthermore, Floyd has not alleged any facts to support the conclusion that treating Avista and GCM as separate corporate entities will cause injustice or unfairness. *See PXP*, 342 A.3d at 417. Therefore, Floyd has not alleged sufficient facts to pierce the corporate veil and hold Avista liable for the acts of GCM.

**B. Avista Direct Liability**

**1. Submission of False Claims or False Statements (Counts I and II)**

Avista moves to dismiss Counts I and II of fraud under the FCA. A defendant is liable under the FCA if he "presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B). To state a claim of fraud under the FCA, a plaintiff "must allege with particularity: (1) the defendant made a statement in order to receive money from the government; (2) the statement was false; and (3) the defendant knew the statement was false." *United States ex rel. Enloe* v. *Heritage Operations Grp., LLC*, No. 24-1431, 2026 WL 2389722, at *3 (7th Cir. Aug. 17, 2026) (quoting *Berkowitz*, 896 F.3d at 840). "[M]ere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish liability under the FCA," there must be affirmative action on the part of the defendants. *United States ex rel. Sikkenga* v. *Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 714–15 (10th Cir. 2006); *see also United States ex rel. Schmidt* v. *Zimmer, Inc.*, 386 F.3d 235, 243–44 (3d Cir. 2004) ("[T]he crucial issue was whether the defendants knowingly assisted in the presentation of false claims…." (analyzing *United States* v. *Bornstein*, 423 U.S. 303, 307, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976) and *United States ex rel. Marcus* v. *Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943)).

Avista argues that Floyd has not plausibly alleged that Avista presented any false claims or made any false statements, or that it caused any to be presented or made. In response, Floyd argues that Avista exercised operational control over GCM and, in doing so, caused GCM to make false claims or statements. Although Floyd alleges that Avista "managed and controlled GCM," Floyd has not specifically alleged that Avista made any false statement or caused any false statement to be made. (Dkt. 66 ¶ 19.) Floyd fails to allege that Avista had any "affirmative participation or action" that caused GCM to make false statements or claims. *See United States ex rel. Lisitza* v. *Par Pharm. Companies, Inc.*, No. 06 C 06131, 2013 WL 870623, at *4 (N.D. Ill. Mar. 7, 2013) (citing *Sikkenga*, 472 F.3d at 714–15). Floyd's allegations here are therefore insufficient.

Furthermore, Avista argues that Floyd has not met the heightened pleading standard necessary to state a claim of fraud under the FCA because Floyd failed to specify the role Avista played in the allegedly fraudulent scheme. Floyd argues in response that his allegations provide extensive detail about the scheme and "Avista's control relationship." (Dkt. 58 at 12.) "[W]hen the complaint accuses multiple defendants of participating in the scheme to defraud, the plaintiffs must take care to identify which of them was responsible for the individual acts of fraud." *Jepson, Inc.* v. *Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994) (citation omitted); *see United States ex rel. Walner* v. *NorthShore Univ. Healthsystem*, 660 F. Supp. 2d 891, 897 (N.D. Ill. 2009) (dismissing FCA claim where relator failed to plead each defendants' role in the fraud). Floyd alleges some essential elements against "Defendants" collectively, such as asserting that "Defendants" sent certifications that falsely state components were conforming to specifications, (dkt. 66 ¶ 136,) but none of the allegations of fraud against Avista identify any individual act performed by Avista or any Avista employee. These allegations do not satisfy Rule 9(b)'s

particularity requirement, as they do not identify which defendant was responsible for each alleged act of fraud, or even name a single responsible Avista employee. *See Jepson*, 34 F.3d at 1328. For these reasons, the court dismisses Counts I and II against Avista without prejudice.

**2. FCA Retaliation (Count III)**

Avista argues that Floyd's retaliation claim should be dismissed because Avista was not Floyd's employer and that GCM, not Avista, took the allegedly retaliatory action of terminating Floyd. Floyd argues in response that Avista managed and controlled GCM, and therefore Avista is liable for taking retaliatory action against Floyd.

Under the FCA, any employee, contractor, or agent is entitled to relief if "(1) the employee's actions were in furtherance of a FCA action or preventing a FCA violation (protected conduct requirement); (2) the employer knew the employee engaged in protected conduct (notice requirement); and (3) the employer took a retaliatory action in response." *Lewis* v. *AbbVie Inc.*, 152 F.4th 807, 813 (7th Cir. 2025) (citation omitted); 31 U.S.C. § 3730(h).

By Floyd's own allegations, he was hired by and worked for GCM. He has not alleged that he was an employee, contractor, or agent of Avista. As discussed above, Floyd has not alleged facts sufficient to hold Avista vicariously liable for GCM's actions. Floyd has alleged insufficient facts to show that Avista "took a retaliatory action" against him (a required element of a retaliation claim), or even that Avista had the power to terminate his employment. *See Lewis*, 152 F.4th at 813 (citation omitted). As such, the court dismisses Count III against Avista without prejudice.

## II. Federal Claims Against GCM

### A. Submission of False Claims or False Statements (Counts I and II)

GCM presents three arguments for why Floyd's allegations of FCA fraud against GCM should be dismissed: (1) Floyd's allegations lack particularity under Rule 9(b); (2) Floyd fails to allege any connection between a false statement and a claim for funds from the government; and (3) Floyd fails to allege the materiality of the false statement to any such claim. As stated above, the following three elements of an FCA claim must be stated with particularity: "(1) the defendant made a statement in order to receive money from the government; (2) the statement was false; and (3) the defendant knew the statement was false." *Berkowitz*, 896 F.3d at 840 (citations and quotations omitted). "In addition, the defendant's misrepresentation must have been material to the government's payment decision; the Supreme Court has characterized the materiality requirement as 'rigorous.'" *United States ex rel. Mamalakis* v. *Anesthetix Mgmt. LLC*, 20 F.4th 295, 300 (7th Cir. 2021) (quoting *Universal Health Servs., Inc.* v. *United States ex rel. Escobar*, 579 U.S. 176, 181 (2016) ("*Escobar*")).

#### 1. Rule 9(b) Particularity

GCM first argues that Floyd's allegations of fraud should be dismissed because they lack particularity. Under the Rule 9(b) particularity standard, plaintiffs must plead the "who, what, when, where, and how" of the alleged fraud. Floyd argues the pleading requirements under Rule 9(b) should be relaxed because he lacks access to facts about fraud committed against third parties. The particularity standard may be relaxed to permit allegations on information and belief when "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions." *Berkowitz*, 896 F.3d at 841 (quotations and citations omitted). But even when the heightened standard is relaxed, the plaintiff "must still describe the

predicate acts with some specificity to inject precision and some measure of substantiation into his allegations of fraud." *Id*. (quotations and citations omitted.)

GCM contends that Floyd's categorical descriptors like "frequently," "regularly," or "numerous" in support of his claimed fraudulent schemes do not identify with particularity any specific examples of fraud. Floyd argues in response that his allegations have sufficient particularity because Floyd has alleged the "who, what, when, where, and how" of specific examples of GCM's fraudulent activity. To allege a lengthy fraudulent scheme involving numerous transactions, Floyd may "allege representative examples of the fraud with particularity." *See United States* v. *Heritage Operations Grp., LLC*, 622 F. Supp. 3d 679, 689 (N.D. Ill. 2022) (quoting *United States* v. *Addus HomeCare Corp.*, 2017 WL 467673, at *10 (N.D. Ill. 2017)). The court will evaluate each alleged example of fraud by Rule 9(b)'s particularity standards to consider if Floyd has sufficiently stated a claim of fraud.

**a. Rod Certification Fraud**

Floyd alleges that on April 20, 2020, he discovered that a shipment of rods manufactured for Solar Turbines had been certified by someone else using Floyd's credentials in the Epicor system. Floyd deduced a time frame for inspection based upon the inspection report in Epicor and his observations at the facility and concluded that the rods could not have been inspected at all. Floyd alleges that either Amy FNO, Gill, or James FNO is "who" falsified this report, but he does so only upon belief. Fraud may not generally be pleaded based upon information and belief, but the pleading standards may be relaxed here because (1) GCM did not permit Floyd to see the tapes of the inspection hold, and (2) Floyd provided the reasons for his suspicion, based upon the contradiction in Arcari's representation that there were no irregularities on the tapes. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr.* v. *Walgreen Co.*, 631 F.3d 436, 443 (7th Cir.

2011) (citations omitted); *Cincinnati Life Ins. Co.* v. *Beyrer*, 722 F.3d 939, 948 (7th Cir. 2013). Floyd has alleged "what" occurred and "where" with particularity, describing with detail what system was used for creating a false inspection report in the inspection hold area. Specifying the day "when" the rods were shipped, April 19 or 20, 2020, is also sufficiently particular. *See, e.g., Hefferman* v. *Bass,* 467 F.3d 596, 601 (7th Cir. 2006) (finding date range "some time in late August or early September 2003 late at night—it was after midnight" sufficiently specific under Rule 9(b) (internal quotations omitted)). And Floyd describes "how" the fraud was communicated to him by Muñoz, and "how" Floyd discovered that the rods could not have been inspected based upon the timing of the inspection report. Therefore, the rod certification fraud example meets Rule 9(b)'s heightened pleading standard because it has described the "who, what, when, where, and how" of the fraud. *See Berkowitz*, 896 F.3d at 839 (quotations and citations omitted). Furthermore, even GCM admits that this example is "plausibly specific." (Dkt. 53 at 7.)

**b. Duplicate Inspection Reports**

Another example of fraud that Floyd alleges involves duplicate inspection reports. He alleges that "[o]n more than one occasion," language from prior inspection reports was cut and pasted into successive reports, making the reports false because no two components can have the same physical characteristics. (Dkt. 66 ¶ 53). This example does not meet the "when" requirement, as Floyd simply alleges it occurred "[o]n more than one occasion" where Floyd was employed at GCM for more than a year. *See Cook* v. *Exelon Corp.*, No. 01 C 7406, 2002 WL 31133274, at *5 (N.D. Ill. Sept. 26, 2002) ("Providing broad time ranges when misrepresentations were made is not sufficient to satisfy Rule 9(b)." (citations omitted)); *see, e.g., Beyrer*, 722 F.3d at 949 (fraud claim insufficiently particular where it was allegedly

committed some time in five- and seven-month periods). Additionally, Floyd does not identify a single specific component or customer involved in these allegedly fraudulent reports, rendering the "what" element insufficiently specific. Moreover, one would assume that the date that Floyd observed the reports, or the customers or components named in the reports, would have been accessible to him, so Rule 9(b)'s standard cannot be relaxed here. *See Berkowitz*, 896 F.3d at 841. Therefore, this instance of fraud does not meet Rule 9(b)'s heightened pleading standard.

**c. Inlet Base Certification Fraud**

In the next example, Floyd alleges that GCM manufactured inlet bases for SpaceX that failed to pass inspections nearly 50% of the time because of problems with the thread and pocket depths, and yet "virtually" all orders were certified as being in full conformance. (Dkt. 66 ¶ 88.) Just like the duplicate inspection records example above, this instance of fraud does not describe "when" with particularity; Floyd only provides the broad date range "during his employment." (Dkt. 66 ¶ 88.) Additionally, while Floyd does identify the individuals who informed him of the problems with the machining of the parts, he does not allege "who" falsely certified that the inlet bases were in full conformance despite problems with thread and pocket depths. There is no apparent reason why Floyd would be unable to access this information, and none is asserted by Floyd. This example of fraud does not meet Rule 9(b)'s particularity standard.

**d. Inner and Outer Core Certification Fraud**

Floyd then alleges that GCM falsely certified that inner and outer cores sent to SpaceX were in full compliance with specifications, despite regularly being out of conformance with quality limits. Again, Floyd does not allege "when" this instance of fraud occurred beyond the broad description that it occurred "regularly." (Dkt. 66 ¶ 90.) This, like the allegations regarding the inlet bases manufactured for SpaceX, is too broad of a date range to satisfy Rule 9(b). And

Floyd does not specify "who" sent e-certifications to SpaceX or who fraudulently certified the inner and outer cores. There is, again, no apparent reason why Floyd would lack access to this information, and none is asserted. Therefore, the inner and outer core certification fraud has not been alleged with sufficient particularity.

**e. Surgical Cannulas Certification Fraud**

Finally, Floyd alleges that surgical cannulas manufactured for Intuitive were inspected and found not to conform with ISO 13485 but were nevertheless falsely certified as being in full compliance. Floyd does not allege "when" this occurred, other than "on numerous occasions," which, like the above examples, is not specific enough to satisfy Rule 9(b)'s heightened pleading standard. Floyd does not sufficiently allege "who" committed the fraud. He has neither named the GCM employees who provided false certifications to Intuitive nor named the quality manager that Floyd informed of the nonconformance. Again, there is no asserted reason why this information was not accessible to Floyd. Therefore, Floyd has failed to allege the surgical cannula certification fraud with sufficient particularity.

Therefore, only the example of rod certification fraud on April 20, 2020, meets the Rule 9(b) particularity standard. All other examples are insufficiently particular as alleged.

**2. Connection to a Claim**

GCM then claims that Floyd's allegations of fraud should be dismissed because they fail to show that GCM made any false statements in order to receive money from the government. To plead fraud under the FCA, a plaintiff must allege with particularity that the defendant made a false statement in order to receive money from the government. *Berkowitz*, 896 F.3d at 840 (citations and quotations omitted); *see United States ex rel. Gravett* v. *Methodist Med. Ctr. of Illinois*, 82 F. Supp. 3d 835, 842 (C.D. Ill. 2015) ("[T]he failure to provide specific information

of at least a single false claim that was actually submitted for payment is fatal to a relator's action under the FCA." (citation omitted)).

GCM argues that even if Floyd alleged the rod certification fraud with sufficient particularity, Floyd fails to link that false certification to a claim submitted to the government for payment. Floyd argues that the heightened pleading standard should be relaxed for the connection between fraud and a claim submitted to the government because the claims are submitted via third parties, outside the relator's access. To show a false claim was submitted to the government, it is not "essential for [Floyd] to produce the invoices (and accompanying representations) at the outset of the suit." *See Lusby*, 570 F.3d at 854. But even if the heightened pleading standard were to be relaxed here due to Floyd's lack of access to information regarding Solar Turbines's submission of claims to the government, Floyd "must still describe the predicate acts with some specificity to inject precision and some measure of substantiation into his allegations." *See Berkowitz*, 896 F.3d at 841 (citations and quotations omitted). However, Floyd does not allege that this particular shipment of rods was manufactured pursuant to a government contract, let alone any details to substantiate such a conclusion.

The only connection alleged between the rod certification fraud and payment from the government is that the rods in this instance were manufactured for Solar Turbines, and, upon information and belief, <u>some</u> of the rods Floyd inspected during his employment were manufactured for Solar Turbines pursuant to four government contracts awarded to Solar Turbines between October 2019 and June 2020, totaling approximately $642,573.[7] Floyd does not allege that the example shipment of rods was manufactured for Solar Turbines pursuant one

[7] Notably, the largest contract by far (valued at $406,621.80) was awarded on June 30, 2020—two months *after* the alleged fraudulent shipment of rods.

of these government contracts, or even that a significant portion of the rods GCM manufactures for Solar Turbines are manufactured pursuant to government contracts.

Floyd relies on *United States ex rel. Sloan* v. *Waukegan Steel, LLC* to argue that he does not need to allege specific facts regarding the claims the prime contractors submitted to the government and the precise amounts paid. No. 15 C 458, 2018 WL 1087642, at *3 (N.D. Ill. Feb. 28, 2018). Although the court in *Sloan* allowed an FCA claim to proceed that was "light on specific details" as to the circumstances of payment, the alleged fraud was committed to fulfill a purchase order from the prime contractor specifically for work on a government contract. *Id.* at *4. In contrast, Floyd fails to allege that the example of rod certification fraud was connected to a government contract at all. While GCM's subcontractor status and Floyd's position outside of the billing department may relieve him of some obligation to provide payment or invoice details, he still must allege that the rod certification fraud example is somehow connected to a payment obligation by the government, even if he cannot provide details of any payment itself. *See United States ex rel. Mamalakis* v. *Anesthetix Mgmt. LLC*, 20 F.4th 295, 302 (7th Cir. 2021) (sufficient to state an FCA claim where plaintiff alleged ten examples of fraud, each of which involved a patient insured by Medicare or Medicaid, and each of which was billed to the government, without identifying specific false invoices because plaintiff lacked access to billing records); *Shmushkovich* v. *Home Bound Healthcare, Inc.*, No. 12 C 2924, 2015 WL 7251934, at *4–5 (N.D. Ill. Nov. 17, 2015) (sufficient to state an FCA claim where plaintiffs alleged five patients receiving inappropriate care were Medicare patients and the "vast majority of the services performed by [defendant] are ultimately reimbursed by Medicare," despite plaintiffs not having access to, and therefore not alleging, specific billing details).

Floyd also does not allege facts that would permit the court to make a reasonable inference that the example shipment of rods was likely manufactured pursuant to Solar Turbines's government contracts, such as that many or most of the rods GCM produced for Solar Turbines were for government contracts. *See United States ex rel. Kennedy* v. *Aventis Pharms., Inc.*, 512 F. Supp. 2d 1158, 1167 (N.D. Ill. 2007) (finding reasonable inference that claims for reimbursement of off-label uses of pharmaceutical drug were submitted to federal or state government for payment "[g]iven the significant proportion of medical care in this country that is financed by Medicare and Medicaid.").

Floyd's rod certification example involves one shipment of rods to Solar Turbines that was falsely certified. This does not support a reasonable inference that at least one false claim was submitted to the government. Thus, Floyd fails to connect the rod certification fraud to any single false claim submitted for payment to the government, and the rod certification fraud example therefore fails to state a claim.

**3. Materiality**

GCM argues, moreover, that Floyd's allegations of fraud under the FCA should be dismissed because Floyd has not sufficiently alleged that any false statement made was material to the Government's payment decision. To state a claim of fraud under the FCA, a plaintiff must show that "the false statement was material to the government's decision to pay or approve the false claim." *Bellevue* v. *Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 716 (7th Cir. 2017) (quotations and citations omitted). "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Escobar*, 579 U.S. at 194; *see also United States ex rel. Enloe* v. *Heritage Operations Grp., LLC*, No. 24-1431, 2026 WL 2389722, at *5

(7th Cir. Aug. 17, 2026) (affirming dismissal for failure to plead materiality of a regulatory requirement, explaining the plaintiff's "allegations must show that 'the government actually attaches weight to that requirement and relies on compliance with it.'" (quoting *United States ex rel. Prose* v. *Molina Healthcare of Ill., Inc.*, 17 F.4th 732, 740 (7th Cir. 2021)).

The demanding materiality standard is fact-specific and eschews bright-line rules, but some of the non-dispositive factors considered include "(1) the Government's decision to expressly identify a provision as a condition of payment, (2) whether the government continued to make payments after learning of the falsehood, and (3) whether the misrepresentation cuts to the 'very essence of the bargain' at issue." *United States ex. rel. Streck* v. *Eli Lilly & Co.*, 152 F.4th 816, 846 (7th Cir. 2025) (quoting *Escobar*, 579 U.S. at 194–95). Nonetheless, materiality is not "too fact intensive for courts to dismiss False Claims Act cases on a motion to dismiss … plaintiffs must also plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality." *Escobar*, 579 U.S. at 195 n.6.

GCM argues that even if the rod certification fraud was alleged with sufficient particularity, Floyd fails to allege facts supporting materiality because he does not allege that these false claims are the type the government usually does not pay. In response, Floyd argues that materiality is satisfied because quality control and contractual compliance is an obligation under the Federal Acquisition Regulation.[8] The rods in question were noncompliant with

---

[8] Floyd also argues that the government's criminal case against a quality engineer for falsifying inspection reports on components used for SpaceX rockets provides strong evidence of the government's compliance priorities. (Dkts. 58 at 6; 66 ¶¶ 6, 83.) While this might support the inference that inspection falsification relating to components manufactured for SpaceX rockets is material to the government's payment, the connection is too attenuated to extend this inference to false certification for components manufactured for Solar Turbines—a company in a different sector and under a different contract. *See Enloe*, 2026 WL 2389722, at *5 (plaintiff's reliance on prior government settlements to show that compliance with regulations is a material condition to receive payment from government was insufficient to show materiality when the conduct at issue in those settlements was too different from the alleged conduct at issue).

contractual specifications because GCM's contract with Solar Turbines required rods to be 100% inspected, and Floyd alleges that these rods were not inspected at all. But the false certification's noncompliance with contractual requirements and federal regulations does not necessarily make the noncompliance material to the government's payment decision. *See Escobar*, 579 U.S. at 194 ("A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment."). Furthermore, just because the false certification was noncompliant with Solar Turbines's contractual requirements for GCM does not mean that there was any noncompliance with a government contract. Rather, Floyd must show that the false claim was material to the government's payment, not Solar Turbines's payment to GCM. *See Bellevue,* 867 F.3d at 716. Based on Floyd's allegations, it is not reasonable to infer either that the government expressly identified the rod certification as a condition of payment to Solar Turbines or, as pointed out in *Streck*, that the certification "cuts to the very essence of the bargain." 152 F.4th at 846 (quotation and citation omitted). Therefore, Floyd has not sufficiently alleged materiality in addition to connection to a claim for payment.

For the above reasons, Counts I and II, Floyd's claims against GCM of fraud under the FCA, are dismissed without prejudice.

**B. FCA Retaliation (Count III)**

For a claim of retaliation under the FCA, a plaintiff must plead that "(1) the employee's actions were in furtherance of a FCA action or preventing a FCA violation (protected conduct requirement); (2) the employer knew the employee engaged in protected conduct (notice requirement); and (3) the employer took a retaliatory action in response." *Lewis*, 152 F.4th at 813 (quotations and citations omitted). For the second element (i.e., the notice requirement), a relator

"need not have knowledge of the FCA, nor utter any magic words like 'False Claims Act,' but he must make it clear that his complaints were aimed at preventing the [employer's] submission of false or fraudulent claims to the government." *Id.* at 814 (quotations and citations omitted). "'Merely informing an employer it is not complying with a statutory, regulatory, or contractual requirement' is not sufficient." *Id.* (quoting *United States ex rel. Sorenson* v. *Wadsworth Bros. Constr. Co., Inc.*, 48 F.4th 1146, 1160 (10th Cir. 2022)).

GCM argues that Floyd's reports and internal complaints did not mention that GCM might be committing fraud against the government, so GCM was not on notice of any conduct protected under the FCA. In response, Floyd argues that he did not need to explicitly cite the FCA when giving notice to GCM, because reporting allegedly fraudulent false inspection reports is enough to put GCM on notice. The Seventh Circuit's decision in *Lewis* is instructive here. 152 F.4th 807. The court in *Lewis* distinguished between the notice requirements in a typical FCA retaliation case involving a company directly submitting false claims to the government and a case involving a company "causing third parties to defraud the government," noting "the longer the chain of causation, the less related protected conduct and notice become." 152 F.4th at 815. If the employer directly defrauds the government, "an employee who complains about his boss submitting false invoices to the government for payment need say little more to satisfy notice because the conduct is so obviously linked to fraud." *Id*. (citations omitted). If the employer causes third parties to defraud the government (the subcontractor scenario), an employee's communications to his boss need to "plausibly convey[] a connection to the FCA or unlawful claims for government payment." *Id*. (quotations and citations omitted).

Here, although Floyd alleges that he reported his suspicions of misconduct and fraud to GCM several times, he does not allege that he conveyed that he was attempting to stop GCM

from claiming unlawful or fraudulent payments from the government. GCM itself does not make claims for government payment; instead, GCM manufactures parts for private companies, and some of the parts produced by GCM are manufactured pursuant to those companies' government contracts. Therefore, Floyd's communications to GCM would need to "steer [GCM] toward the FCA" to satisfy the notice requirement, but Floyd's communications on their face do not imply that GCM's misconduct would defraud the government. *See Lewis*, 152 F.4th at 816. Instead, the "obvious alternative explanation" of Floyd's complaints is that GCM's misconduct violated their contractual obligations and regulatory requirements, not the FCA. *Id.* at 815 (quoting *Twombly*, 550 U.S. at 567). This is particularly so considering that Floyd specifically mentioned the Arms Export Control Act and the International Traffic in Arms Regulations when speaking with Meagher, and not the FCA. *See Lewis*, 152 F.4th at 815–16 (affirming dismissal of retaliation claim for lack of notice when relator's complaints more plausibly alerted employer about violating FDA's regulations, not the FCA); *Farr* v. *Ross Fin. Servs., Inc.*, No. 25-CV-1936-JPG, 2026 WL 2150198, at *4 (S.D. Ill. July 27, 2026) (dismissing FCA retaliation claim where "none of [plaintiff's] internal complaints … suggested that she was concerned with fraud against the United States as opposed to mere noncompliance with applicable regulations."); *Kennedy*, 512 F. Supp. 2d at 1168 (plaintiff's complaints about off-label marketing were insufficient to put employers on notice that she suspected fraud against government via third-party or that she was pursuing or assisting in making an FCA claim).

As the Seventh Circuit noted in *Lewis*, the Supreme Court has repeatedly cautioned that "the False Claims Act is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id*. at 815 (quoting *Escobar*, 579 U.S. at

194 (internal quotations marks omitted)). Floyd must have made it clear to GCM that his complaints were aimed at preventing submission of false or fraudulent claims to the government.

Therefore, the allegations of the complaint do not permit the inference that GCM was on notice that Floyd's conduct in reporting fraud was protected under the FCA. Accordingly, Floyd's claim of retaliation by GCM under the FCA (Count III) is dismissed without prejudice.

### III. State Law Claims (Counts IV and V) Against Avista and GCM

Since the court has dismissed Floyd's federal claims, his remaining claims under the Illinois Whistleblower Act (Count IV) and Illinois common law retaliatory discharge (Count V) will be dismissed without prejudice for lack of supplemental jurisdiction.[9] *See* 28 U.S.C. § 1367(c)(3); *Coleman* v. *City of Peoria, Illinois*, 925 F.3d 336, 351–52 (7th Cir. 2019).

## CONCLUSION AND ORDER

For the foregoing reasons, Avista's and GCM's motions to dismiss are granted, and Floyd's federal claims under the FCA are dismissed without prejudice under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Floyd's state-law claims are dismissed without prejudice for lack of supplemental jurisdiction. Floyd has until October 15, 2026, to file an amended complaint that is consistent with this opinion. If he elects not to do so, the dismissals without prejudice will be converted to dismissals with prejudice on October 16, 2026.

Date: September 17, 2026

Joan H. Lefkow

U.S. District Judge Joan H. Lefkow

---

[9] It is not entirely clear if Floyd has alleged Counts IV and V against Avista or GCM because Floyd only asserts those counts against an undefined singular "Defendant." (Dkt. 66 ¶¶ 165–72.) In any case, Counts IV and V lack subject matter jurisdiction.